UNITED STATES DISTRICT COURT
NORTHERN DIVISION OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| FRANSHON D. THOMAS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
| v. | ) | 4:07-CV-56-AS |
|  | ) |  |
| FAIRFIELD MANUFACTURING CO., INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION AND ORDER

On September 26, 2007, *pro se* plaintiff Franshon Thomas ("Plaintiff" or "Mr. Thomas") brought suit against his former employer, Defendant Fairfield Manufacturing Co., Inc. ("Defendant" or "Fairfield"), alleging that Fairfield subjected him to a hostile work environment, discriminated against him because of his race, and retaliated against him for complaining about the racial harassment/discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981 (Doc. No. 1). Mr. Thomas' Complaint is based on incidents occurring between May and October 2006. Specifically, Mr. Thomas claims that his co-worker, Gary Long, once told him to get his "black feet" over here and once called him a "black bastard." Mr. Thomas also claims that he was unlawfully disciplined for complaining about the "black feet" remark and transferred to a different job within his department.

On February 27, 2009, Defendant filed a Motion for Summary Judgment (Doc. Nos. 23), along with the appropriate notice to Mr. Thomas of the summary judgment filing, warning of the possible consequence for failing to timely and properly respond to the motion (Doc. No. 26). *See,* N.D. Ind. L.R. 56.1(e), App. C; *See also, Kincaid v. Vail,* 969 F.2d 594, 599 (7th Cir. 1992); *Timms v. Frank,* 953 F.2d 281, 285-86 (7th Cir. 1992); *Lewis v. Faulkner,* 689 F.2d 100 (7th Cir. 1982).

Despite this warning, Mr. Thomas failed to timely respond.

This Court is keenly aware of its obligation to hold this *pro se* Plaintiff's pleadings to a less stringent standard than those drafted by attorneys. *See, Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Alvardo v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). However, "[*P*]*ro se* litigants are masters of their own complaints," and "District judges have no obligation to act as counsel or paralegal to *pro se* litigants." *Myles v. United States*, 416 F.3d 551, 552 (7th Cir. 2005). Here, this Court has given all reasonable leniency to Mr. Thomas on account of his *pro se* status. Nonetheless, Mr. Thomas has failed to respond to the motion for summary judgment and failed to show that there is a genuine issue for trial. For the reasons that follow, Fairfield's motion is **GRANTED**.

## I. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The moving party bears the burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" that the moving party believes demonstrate an absence of genuine issue of material fact. *Celotex Corp.*, 477 at 323. Once this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.

1989). "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment is proper.

## II. FACTUAL BACKGROUND

The Court adopts the undisputed material facts recited in Fairfield's brief in support of summary judgment (Doc. No. 24), as follows:

Fairfield currently employs over 1,000 employees manufacturing custom gears, gear sets, power transmission assemblies, and other related products, and has its manufacturing facility in Lafayette, Indiana. Mr. Thomas is an African-American and began his permanent employment with Fairfield on June 21, 2004. While Mr. Thomas is no longer a Fairfield employee (the reason for which is not the subject of this lawsuit), at all relevant times he worked as a second-shift production employee in Fairfield's Returns area or Assembly area of the Materials Department, and his supervisor was Mike Pyatt ("Mr. Pyatt").

Fairfield maintains an anti-harassment policy, which prohibits harassment based on race and other legally protected characteristics and contains clear instructions for how to report harassment. Aff. Clark, ¶ 10, Exb. 1. Plaintiff admitted that he received a copy of this policy and knew how to report harassment. Fairfield also maintains Work Rules and Regulations for its hourly employees, which provide in part, "All employees are expected to act in a safe, cooperative, courteous, and productive manner at all times while at work." In addition, they prohibit use of malicious, abusive, or harassing language. *Id.* at Exb. 2. Plaintiff conceded that he was familiar with these rules.

The UAW and its Local 2317 represent Fairfield's hourly production employees, including Mr. Thomas, and at all times relevant to this lawsuit, the Collective Bargaining Agreement ("CBA") between Fairfield and UAW Local 2317 gave Fairfield's management the right to assign employees to perform work in any area of the department to which they were assigned. Aff. Clark, ¶ 11, Exbs. 3, 4. Intra-departmental transfers (including transfers within the department to which Mr. Thomas was assigned) are not uncommon and entail no loss of pay or benefits.

In the Returns area, Mr. Thomas disassembled defective units, analyzed defects, and rebuilt the units. In November 2004, Mr. Thomas and Gary Long (a Caucasian male) began working together in the Returns area. Most of the time, only two employees were assigned to the area during second shift, and therefore an unscheduled absence of either employee caused a disruption in the functioning of the Materials Department.

Mr. Thomas admitted that his relations with Mr. Long were initially friendly, but the relationship soured at some point in 2005. Specifically, Mr. Thomas testified that he and Mr. Long went out to a bar together after work and he overheard Mr. Long make an inappropriate remark to a woman. Because Mr. Thomas "didn't appreciate" the way Mr. Long treated women, after that night he tried not to deal with Mr. Long any more. Thomas Depo, p. 138-41. Whatever the reason for their falling out, the evidence is undisputed that Mr. Thomas and Mr. Long began bickering at work. More than once, Mr. Pyatt met with them, counseled them about the need to cooperate, and told them to contact a supervisor if they had problems and warned them not to take matters into their own hands. Aff. Pyatt, ¶ 9.

Yet, Mr. Thomas and Mr. Long continued to argue over a period of approximately nine months and the conflict reached a head in January 2006. One night, Mr. Long began washing some

4

parts in a solvent tank, and Mr. Thomas took exception because he thought that Mr. Long should use another solvent tank. The argument escalated to the point that witnesses observed Mr. Thomas and Mr. Long yelling and telling each other "fuck you."

Frustrated with the ongoing conflict, Mr. Pyatt sought the assistance of Labor Relations Manager Vicki Clark ("Ms. Clark"). Ms. Clark and Mr. Pyatt interviewed other employees in the area and learned that both men had made it clear that they did not like one another anymore. Even Mr. Thomas conceded, however, that there was nothing racial about this mutual dislike at this point. Thomas Depo., p. 164.

As part of this investigation, Ms. Clark and Mr. Pyatt met separately with Mr. Thomas and Mr. Long. Also present at each meeting were Senior Area Manager Jack Dykhuizen (Mr. Pyatt's boss) and union representative Sherri Hinton. When asked what was going on between him and Mr. Long, Mr. Thomas responded:

> This guy [Long] doesn't do anything back there. Been caught sleeping, pees on the floor and in a bottle back there and all he has done is nothing. Nothing is done.... We don't get along because nobody will do anything to him, and I yell at him because nobody does anything about it and he does everything he can do to aggravate me....

Thomas Depo., p. 145. The nature of the conflict was further underscored by the meeting with Mr. Long, who complained that Mr. Thomas was calling him a "queer." In fact, Mr. Thomas admits to asking Mr. Long on several occasions if he was gay. Thomas Depo., p. 150-51, 170.

Based on the investigation, Mr. Pyatt and Ms. Clark determined that both Mr. Thomas and Mr. Long had failed to comply with Fairfield's Work Rules through their ongoing conflict, and on or about January 22, 2006, they gave identical verbal warnings to Mr. Thomas and Mr. Long.

Thomas Depo., p. 152-54, Exb. 22; Aff. Clark, ¶ 16, Exbs. 7, 8. Mr. Thomas admitted that Fairfield treated him and Mr. Long exactly the same with respect to these warnings. Thomas Depo., p. 154.

Despite these warnings, Mr. Thomas and Mr. Long continued to clash. On January 30, Mr. Long reported to Ms. Clark that he feared Mr. Thomas might challenge him to a fight and was afraid to leave his food out because Mr. Thomas might mess with it. Aff. Clark, ¶ 17. At that point, Ms. Clark brought Mr. Thomas and Mr. Long together to remind them again of the consequences of failing to work together cooperatively. At the meeting, Mr. Thomas and Mr. Long began arguing, with Mr. Thomas calling Mr. Long "lazy," and Mr. Long complaining that Mr. Thomas called him "gay." Ms. Clark intervened and told them in certain terms that Fairfield expected them to work together cooperatively. In connection with the warnings, in early February, Mr. Thomas and Mr. Long also were required to see a counselor and submit plans of action indicating how they would resolve their problems. Thomas Depo., p. 160-62.

However, the conflict continued. On April 29, 2006, second shift Area Manager Dan Barnard sent Ms. Clark an email recounting another argument between Mr. Thomas and Mr. Long: "Just wanted to let you know that Gary Long and Franshon Thomas are not getting along again (or still). Seems they both thought they needed to use the same set of hooks to handle some parts. I found another set of hooks for one of them to use and ordered another set, so there would be 2 sets out there. Wish kids would learn to share their toys." Aff. Clark, ¶ 20, Exb. 13.

At the beginning of May—long after Mr. Thomas started calling Mr. Long "gay" and accusing him of following Mr. Thomas to the bathroom—Mr. Thomas told Mr. Pyatt that Mr. Long had made a racially offensive comment. Mr. Pyatt contacted Ms. Clark immediately, and Mr. Thomas admitted that the response confirmed that Fairfield took racial harassment seriously.

Thomas Depo., p. 167. Once Mr. Pyatt reported the remark, Ms. Clark arranged a meeting to investigate. When asked what happened, Mr. Thomas first complained that Mr. Long had been hiding tools from him and then told a story of a run-in with Mr. Long over a missing top to a soap dispenser. According to Ms. Thomas, when he asked Mr. Long to help find the top, Mr. Long told him to open his eyes and get his "black feet" over here and look for it. Plaintiff admits, however, that no witnesses heard the alleged remark. Thomas Depo., p. 164-67; Aff. Clark, ¶¶ 21-22, Exb. 14.

According to Mr. Thomas' deposition testimony, this remark constituted the first time Mr. Long ever made any racially offensive comments to him. Prior to Plaintiff's complaint about the "black feet" remark, Fairfield had no reason to suspect that Mr. Thomas was suffering any racial harassment. Indeed, Mr. Thomas admits that, during the time frame relevant to this lawsuit, Mr. Long was the only employee at Fairfield who made any racially offensive remarks to him, and he admits that no supervisor or management official at Fairfield ever made any racially offensive remark to him. Thomas Depo., p. 124-25, 135, 149, 167, 169, 185, 191.

Furthermore, Mr. Thomas admitted that he did not consider the "black feet" remark to be particularly serious, rather, he described the remark as somewhere "in between" a fairly minor comment and a comment that was more serious, but still not serious enough to warrant an official complaint to Labor Relations Manager Vicki Clark. *Id.* at 169-70. Mr. Thomas also admitted that he has probably made remarks that were worse than Mr. Long's remark, and that he has heard more offensive remarks at one of his previous places of employment (which formed the basis of an EEOC charge and a lawsuit). *Id.*

After meeting with Mr. Thomas, Ms. Clark had a meeting with Mr. Long during with Mr. Long denied having made the "black feet" remark, but countered by complaining about the repeated

squabbles with Mr. Thomas over sharing tools and claimed that Mr. Thomas had been "on his case" for some time. After his complaints were heard, Mr. Long was reminded that he should call a supervisor if any more problems occurred between the two of them. Aff. Clark, ¶ 23, Exb. 15.

Due to the ongoing disruption to the operation of the Materials Department caused by Mr. Thomas and Mr. Long, on May 25, 2006, Mr. Pyatt and Ms. Clark gave identical written warnings to both Mr. Thomas and Mr. Long for violating Fairfield's Work Rules by refusing to work together cooperatively. Thomas Depo., p. 174; Aff. Clark, ¶¶ 24-25, Exbs. 16, 17; Aff. Pyatt, ¶¶ 17-18. As with the previous warning, Mr. Thomas admitted that Fairfield treated him and Mr. Long equally. Thomas Depo., p. 175. Again, this written warning did not result in any loss of pay. *Id.* at 180. Even though Mr. Thomas disagreed with Fairfield's decision and thought that Mr. Long's discipline should have been more severe, he also admitted that he only thought that they both got wrote up so as to avoid making Mr. Long mad, but not because the write-up had anything to do with Mr. Thomas' race. *Id.* at 176, 179-80.

In addition to the written warning for failure to work cooperatively with Mr. Thomas, Mr. Long was also counseled in connection with the alleged "black feet" remark, even though there were no witnesses to the comment and Mr. Long denied making it. Therefore, Ms. Clark issued a letter to Mr. Long reinforcing Fairfield's anti-harassment policy and warning him that if Fairfield confirmed similar behavior in the future, appropriate discipline would be issued, up to and including termination. Aff. Clark, ¶ 26, Exb. 18.

Important here, is the fact that there were other problems with Mr. Thomas than his inability to get along with Mr. Long. The evidence is undisputed that Mr. Thomas' attendance fell below Fairfield's expectations throughout his employment at Fairfield. Thomas Depo., p. 176-66, 188. For

8

example, in 2005, Mr. Thomas received multiple warnings in connection with his poor attendance, and these problems worsened in 2006, for which he received discipline. Aff. Clark, ¶¶ 27, 28. Between January and October 6 of that year alone, Plaintiff missed all or part of more than 50 days of work, rarely scheduling his absences in advance, leaving one employee to work alone in the Returns area. *Id.*; Aff. Pyatt, ¶ 20. Unlike Mr. Thomas, Mr. Long maintained an exemplary attendance record, not missing a single day of work in 2006 other than 8 approved vacation days. Aff. Pyatt, ¶ 20; Aff. Clark, ¶ 30.

Because of Mr. Thomas' ongoing and increasingly frequent absences, Mr. Pyatt (in consultation with the other managers in the Materials Department) decided in October 2006 to move him to the Assembly area in the same department, because it would better accommodate his absences. With approximately 30 employees working on second shift during the relevant time, the Assembly area was flexible enough to absorb Mr. Thomas' absences without the detrimental effects experienced in the Returns area. Aff. Pyatt, ¶ 21. This reassignment took effect on or about October 9, 2006. Aff. Clark, ¶ 8. In the Assembly area, Mr. Thomas built units from scratch, and the only real difference in his duties after the transfer was that he was no longer required to disassemble units and analyze defects. Aff. Pyatt, ¶ 22. Mr. Thomas continued to work on the second shift and did not suffer any decrease to his rate of pay or benefits after the transfer. Thomas Depo., p. 185; Aff. Clark, ¶ 31.

Mr. Thomas later claimed that, sometime in the Fall of 2006, Mr. Long called him a "black bastard." Mr. Thomas admits that there were no witnesses to the alleged remark, and that he never reported this remark to Mr. Pyatt, Ms. Clark, or any member of Fairfield management. Thomas Depo., p.181. Fairfield had no notice of this alleged remark until it received a copy of the Charge

of Discrimination filed by Mr. Thomas with the EEOC on November 6, 2006. Aff. Pyatt, ¶ 19; Aff. Clark, ¶ 32, Exb. D.

Once Ms. Clark read this allegation, she took steps to investigate it, and on November 29, 2006, she and Area Manager Glen Scruggs asked Mr. Long if he had called Mr. Thomas a "black bastard," which he strongly denied. To the contrary, Mr. Long stated that he had not talked to Mr. Thomas in some time because he no longer worked in the Returns area and that he now ignored Mr. Thomas completely. Ms. Clark could find no evidence to contradict Mr. Long's denial and, thus, did not believe that further discipline could be supported. Aff. Clark, ¶ 33.

Mr. Thomas admitted that he did not experience any other racially offensive conduct between the filing of his EEOC Charge in November 2006 and the filing of the instant lawsuit on September 26, 2007 that have anything to do with the instant lawsuit. Thomas Depo., p. 185, 191-92.

### III. ANALYSIS

(A) **Discrimination**[1]

Title VII of the Civil Rights Act of 1964 provides that it "shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on his race discrimination claim, Mr. Thomas must either proffer direct or circumstantial evidence of his employer's discriminatory motivation/intent (known as the direct method), or rely on the indirect

---

[1] Title VII claims and claims under § 1981 are analyzed in the same way. *See Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004) (stating that § 1981 and Title VII are evaluated under the same rubric and thus, there is no need to address them separately). As such, the Court refers only to Title VII in this order.

burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1114, 1119 (7th Cir. 2009) (citing *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008); *Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005)).

Under the direct method, a plaintiff can establish discriminatory intent by relying on direct or circumstantial evidence. *Nagle*, 554 F.3d at 1114. "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Id.* (citing *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005)). Here, the only alleged racial comments were made by Mr. Long, a co-worker of Mr. Thomas' with no decision-making authority. Because there is simply no admission by any member of Fairfield's management or some "decision maker" that Mr. Thomas was disciplined or reassigned to the Assembly area because of his race, no direct evidence of discriminatory intent exists.

Additionally, Mr. Thomas is unable to establish an inference of discrimination under the direct method by relying on circumstantial evidence. *See Nagle*, 554. F.3d at 1114-15. After Mr. Thomas reported the "black feet" remark made by Mr. Long in or around May of 2006, both Mr. Thomas and Mr. Long received written warnings. However, as with the previous verbal warning, Mr. Thomas admitted that Fairfield treated him and Mr. Long equally. Mr. Thomas further admitted that the "black feet" comment was not that extreme but that Fairfield took the allegation seriously and investigated it. As to the alleged "black bastard" comment made by Mr. Long sometime in the Fall of 2006, Fairfield had no knowledge of it until November 6, 2006, when Mr. Thomas filed his charge with the EEOC. Lastly, it was not until October of 2006, almost five (5) months after reporting the "black feet" comment, that Mr. Thomas was moved to the Assembly area (working

the same shift with the same pay and performing substantially similar duties as before)— this does not constitute suspicious timing. Even if it did, suspicious timing alone its not enough to establish discriminatory intent where the comment was not made by the decision maker, was not made around the time of the decision to transfer, occurred one time, and was not made in reference to any employment action. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) ("[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motived by discriminatory animus.") (citations omitted). Aside, the CBA gave Fairfield's management the right to assign employees to perform work in any area of the department to which they were assigned. There is no indication that Mr. Thomas was ever disciplined or transferred because of his race. With no evidence of record to support Mr. Thomas' claim under the direct method, or any suggestion that Fairfield took materially adverse action against Mr. Thomas on account of his being African American, the Court turns to the indirect method.

Under the indirect approach, Mr. Thomas must present evidence tending to show: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who are not African American. *See Ineichen*, 410 F.3d at 959. If the plaintiff can establish these four elements, the defendant has an opportunity to articulate a legitimate, nondiscriminatory reason for its action. *Id.* at 961. If the defendant does so, the burden shifts back to the plaintiff and he must offer evidence showing that the defendant's excuse is pretextual. *Id.*

Mr. Thomas cannot meet his requirements under the indirect method, aside from the fact that

he is a member of a protected class. First, Mr. Thomas cannot show he was meeting his employer's legitimate performance expectations where he was twice warned about his ongoing confrontation with Mr. Long which violated Fairfield's Work Rules, and was disciplined for his frequent unpredictable absences.

Second, Mr. Thomas suffered no materially adverse action where the verbal and written warning carried no consequences and his reassignment to the Assembly area (in the same department, during the same shift, for the same pay, and with similar job duties) do not constitute adverse actions. *See Nagle*, 554 F.3d at 1120 (a materially adverse change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities") (citing *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)); *Walker v. Mueller Industries, Inc.*, 408 F.3d 328, 332 (7th Cir. 2004) (warnings without any concrete effect on the position, pay and benefits, or prospects with the employer do not constitute adverse employment action or suffice as proof of retaliation) (citations omitted).

Third, Mr. Thomas has not identified any similarly situated white employee given preferential treatment. While Mr. Long is the most similarly situated to Mr. Thomas, even Mr. Thomas admitted that both he and Mr. Long received identical verbal and written warnings. Therefore, there was no preferential treatment. To the extent that Mr. Thomas' transfer to the Assembly area could be considered preferential treatment as to Mr. Long, the very reason for Mr. Thomas' transfer–his excessive absences–distinguish him from Mr. Long. In other words, Mr. Thomas is not similarly situated to Mr. Long because Mr. Long had impeccable attendance, while Mr. Thomas had 50 absences between January and October 2006 alone. Thus, the difference in their attendance distinguishes Mr. Long from Mr. Thomas, and distinguishes Fairfield's treatment of them in

transferring only Mr. Thomas.[2] *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (a similarly situated employee must be "directly comparable in all material respects," such as, whether the employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them).

Mr. Thomas cannot establish a *prima facie* case of racial discrimination. Had Mr. Thomas done so, Fairfield produced sufficient evidence to support its nondiscriminatory reason for disciplining Mr. Thomas and transferring him. Specifically, the record establishes that Mr. Thomas received a verbal and written warning for his ongoing problems with Mr. Long which were investigated and determined to violate Fairfield's Work Rules. Mr. Thomas and Mr. Long received identical warnings for this behavior. Further, Mr. Thomas was transferred because of his frequent unexpected absences which interrupted the Returns area, yet could be better accommodated in the Assembly area. Mr. Long did not have attendance problems, and did not get transferred. Mr. Thomas has not demonstrated that Fairfield's proffered reasons for its actions were merely a pretext for discrimination— that Fairfield's explanation was dishonest. *See Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000) (pretext "means something worse than a business error; pretext means deceit used to cover one's tracks."); *Jackson v. E.J. Brach Corp.*, 176 F.3d 971,

---

[2] Aside from identifying Mr. Long, Mr. Thomas mentioned that there was a "white guy" in his department that was out of work for 45 days, who did not get transferred. Thomas Depo., p. 188-89. Yet, Mr. Thomas admitted that the employee was actually on sick leave during this time. *Id.* at 189-90. There is not enough information to conclude that this unidentified male was similarly situated to Mr. Thomas and received more favorable treatment. *See Nichols v. S. Ill. Univ.*, 510 F.3d 772, 784 (7th Cir. 2007). Even so, the undisputed facts that are available show that Mr. Thomas' frequent absences were unexpected, and therefore were unlike the unidentified white male's scheduled sick leave— thus, they were not similarly situated.

983 (7th Cir. 1999) (holding that so long as the employer honestly believes in the proffered reason for its actions, then there is no pretext "even if the reasons are foolish or trivial or even baseless.").

Accordingly, Mr. Thomas' claim for racial discrimination/harassment fails as a matter of law under both the direct and indirect methods of proof.

**(B)** **Retaliation**[3]

Mr. Thomas claims that Fairfield retaliated against him for reporting what he believed to be unlawful racial harassment. Under Title VII, it is "unlawful for any employer to discriminate against an employee for opposing a practice made unlawful by the Act." 42 U.S.C. § 2000e-3(a). Although Title VII's anti-retaliation provisions are not limited to "ultimate employment decisions," *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 67 (2006), Mr. Thomas must show that the actions of which he complains were "materially adverse" and produced "an injury or harm" that would have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Nagle*, 554 F.3d at 1119 (quoting *Burlington*, 548 U.S. at 67-68). Therefore, in order to establish a *prima facie* case of retaliation under the direct method of proof, a plaintiff must establish that he: (1) engaged in a statutorily protected activity; (2) suffered a materially adverse action subsequent to his participation; and (3) there was a causal link between the adverse action and the protected activity. *Lewis v. City of Chicago*, 496 F.3d 645, 654-55 (7th Cir. 2007) (citations omitted). In order to prove a causal link, "the plaintiff is required to show that the employer would not have taken the adverse action 'but for' the plaintiff's engagement in the protected activity." *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996).

---

3  Analysis of the retaliation claim under Title VII applies equally to the claim under § 1981. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007). Therefore the Court refers only to Title VII, but considers both claims.

15

As the Seventh Circuit has stated, "[A]n employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII . . . ." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005). In this case, Mr. Thomas cannot establish a claim for retaliation under the direct method. First, Mr. Thomas never reported the "black bastard" comment until he filed an EEOC charge, and therefore Fairfield was not aware of the comment until after it disciplined Mr. Thomas and transferred him to the Assembly area, and therefore Fairfield could not have acted based on the prohibited animus. *See Nagle*, 554 F.3d at 1122. Further, since Mr. Thomas did not report the "black bastard" comment, it does not suffice as protected activity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006) (holding that an employer's actions against an employee could not be retaliatory where the employee had not first lodged a complaint that constituted a protected activity).

However, Mr. Thomas did report the alleged "black feet" comment in May of 2006, and thereafter he received a written warning that same month and was later transferred to the Assembly area in October of 2006. The Court does not believe that Mr. Thomas' written warning or transfer constituted materially adverse employment actions, such that a reasonable employee would be dissuaded from engaging in protected activity. *See Lewis*, 496 F.3d at 655. Mr. Thomas did not suffer any hardship connected with the actions, and he kept his normal work hours, pay and benefits, and completed similar job duties. Furthermore, even Mr. Long worked in the Assembly area from time to time, as this was permissible under the CBA. Yet, assuming the warning and transfer were adverse, he is unable to show a causal connection between these events and the protected activity. In fact, Mr. Thomas admitted that he did not believe the write-up had anything to do with his race. Aside, Fairfield wrote-up both Mr. Long and Mr. Thomas for violating Work Rules by failing to

cooperate. In addition, Mr. Thomas was transferred to the Assembly area on October 9, 2006, in order to accommodate his excessive absenteeism, including 50 missed days from January to October. There is no indication that the warning or the October transfer bore any relation to the May 2006 reporting of the "black feet" comment made by Mr. Long. In fact, Fairfield encouraged Mr. Thomas to speak with management if he experienced any other problems or racial harassment. Mr. Thomas cannot establish a causal link between his discipline or transfer, and the protected activity under the third prong of the retaliation claim.

Under the indirect approach, a *prima facie* case of retaliation is shown if Mr. Thomas establishes that he: (1) engaged in statutorily protected activity; (2) met his employer's legitimate expectations; (3) suffered an adverse action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Metzger v. Illinois State Police*, 519 F.3d 677, 681 (7th Cir. 2008). If the *prima facie* case is met, the burden shifts to Fairfield to proffer a legitimate, non-retaliatory reason for the adverse action. *Id.* If Fairfield meets this burden, then Mr. Thomas must show that the reason is pretextual. *Id.* Assuming Mr. Thomas engaged in statutorily protected activity, as previously discussed, he is unable to show that he was meeting Fairfield's legitimate expectations, he cannot show he suffered an adverse action, and/or he has not identified a similarly situated employee who did not engage in statutorily protected activity yet received better treatment than he did. Further, as detailed above, Fairfield has produced sufficient evidence to support its nondiscriminatory reasons for Mr. Thomas' warnings and transfer, and Mr. Thomas has not shown evidence of pretext.

Because Mr. Thomas has failed to show retaliation under the direct or indirect method, summary judgment on this claim is appropriate.

### (C) Hostile Work Environment

To the extent that Mr. Thomas is alleging a hostile work environment based on race, he must establish the following: "(1) he was subjected to unwelcome harassment, (2) the harassment was based on his race, (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) (citing *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005)).

Assuming the first two elements have been established, Mr. Thomas nonetheless fails too meet the latter two elements. In determining whether a workplace is hostile, "[c]ourts examine a variety of factors . . ., including the frequency of the supposed discriminatory conduct; the severity of it; whether the conduct is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's job performance." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). Moreover, the Seventh Circuit has held that, while a racial comment such as the ones alleged by Mr. Thomas is "hardly admirable, and is in fact deplorable," an utterance does not create an objectively hostile work environment. *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 566, (7th Cir. 2004) (finding no hostile work environment where plaintiff heard her colleague refer to other employees as "black motherfuckers"); *cf. Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (finding evidence of a hostile work environment where plaintiff was "repeatedly subjected" to hearing the word "nigger"); *Rodgers v. Western-Souther Life Ins. Co.*, 12 F.3d 668, 673 (7th Cir. 1993) (finding a hostile work environment when supervisors and employees referred to plaintiff by the term "nigger" between five and ten times while he was employed).

That is not to say that a single incident or two is never enough to create a hostile work environment. Indeed, in the context of sex-based discrimination, courts have found evidence of a hostile work environment where a colleague pinned the plaintiff against a wall, called her a "bitch," threatened to do physical harm, and twisted her wrist severely enough to require surgery, *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999), and where a customer pulled his waitress by the hair, grabbed her breast and placed his mouth on it, *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1999); though both of those incidents were isolated one-time occurrences.

Here, the alleged "black feet" and "black bastard" comments were made several months apart, and the latter comment was never reported to Fairfield. Mr. Thomas never reported any other comments made by Mr. Long, and he admitted that Mr. Long was the only employee at Fairfield who ever made any racially offensive remarks to him. Additionally, the comments, though offensive, were not physically threatening, were not said in the presence of witnesses, and did not unreasonably interfere with Mr. Thomas' job performance. The behavior alleged by Mr. Thomas consists solely of isolated utterances that are neither severe or pervasive enough to create a hostile and abusive working environment. Accordingly, Fairfield is entitled to summary judgment on Mr. Thomas' hostile work environment claim.

## IV. CONCLUSION

Based on the foregoing, Defendant Fairfield Manufacturing Co., Inc.'s Motion for Summary Judgment (Doc. No. 23) is **GRANTED**. This case is considered closed, with each party to bear its own costs and fees.

**SO ORDERED.**

**DATED: April 17, 2009**

/S/ ALLEN SHARP
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**